UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————————X

SHARON HAYES,

                    Plaintiff,

      -against-

BERNARD KERIK, COMMISSIONER,
NEW YORK CITY DEPARTMENT OF
CORRECTIONS and NEW YORK CITY
DEPARTMENT OF CORRECTIONS,

                  Defendants.

——————————————————————————X

**OPINION & ORDER**
**CV-99-5725 (SJF)(CLP)**

FILED
IN CLERKS OFFICE
U.S. ——— COURT —— N.Y.
★ FEB 8 2006 ★
P.M. ——————
TIME A.M. ——————

FEUERSTEIN, J.

      Sharon Hayes (plaintiff) commenced this employment discrimination action against

defendants Bernard Kerik, Commissioner, New York City Department of Corrections (the

Commissioner) and the New York City Department of Corrections (the DOC), alleging

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Title VII), and

42 U.S.C. § 1981, as well as a state law claim for intentional infliction of emotional harm. The

Commissioner and DOC (collectively, defendants) now move pursuant to Rule 56 of the Federal

Rules of Civil Procedure for summary judgment dismissing the complaint. For the reasons stated

herein, defendants' motion is granted.

## I.    BACKGROUND

### A.    Factual Background[1]

On February 24, 1986, plaintiff, an African-American female, was appointed as a Correction Officer (CO) at the DOC. On December 4, 1989, plaintiff was promoted to the position of Captain. On June 18, 1990, plaintiff was reassigned from the Otis Bantum Correctional Center (OBCC) on Riker's Island, to the James A. Thomas Center (JATC), another correctional facility on Riker's Island. One of plaintiff's immediate supervisors at the JATC was Assistant Deputy Warden (ADW) Alonzo Davis (Davis), a black male. According to plaintiff, while she was assigned to the JATC, she was engaged in an intimate relationship with another ADW from a different command.

Prior to October 1994, plaintiff had an outstanding attendance record and no formal disciplinary history.

#### 1.    Plaintiff's Suspension

According to plaintiff, on October 13, 1994, some time before 4:30 p.m., she had had a disagreement with the unidentified ADW with whom she was engaged in an intimate relationship. (Transcript of the Examination Before Trial of Plaintiff on July 27, 2000 [Plf. Dep.], p. 50). At approximately 4:30 p.m. on that date, plaintiff entered the control room, where Davis was present as Tour Commander with five COs, and completed an overtime slip for Davis

---

[1] The facts are derived from defendants' statement of material facts pursuant to Local Rule 56.1 and the accompanying affidavits and other evidentiary material filed in support of defendants' motion for summary judgment, as well as plaintiff's statement of disputed material facts and the accompanying declarations and evidentiary material filed in response to the motion. The facts are undisputed unless otherwise indicated.

2

to sign.  Plaintiff admittedly was upset and angry, used profanity and made several derogatory remarks while she was in the control room.  (Id. at 50-51).  According to Davis, one of the derogatory comments made by plaintiff was: "I'm tired of all these Punk motherfucker deps[2]." The parties dispute whether the derogatory remarks were directed at Davis or anyone else in the control room.

In an interdepartmental complaint filed by Davis dated October 17, 1994, he requested that plaintiff be disciplined for, *inter alia*, conduct unbecoming an officer and that she be removed from her post as security captain and administratively transferred out of the JATC facility.  Plaintiff admittedly was not transferred as a result of Davis's recommendation.  (Plf. Dep., pp. 80-81).  At Davis's request, the other COs who were present in the control room on October 13, 1994 also submitted intradepartmental reports, in which they indicated that they heard plaintiff make derogatory comments regarding ADWs on that date.

On October 21, 1994, at Davis's request,  plaintiff submitted a written report, in which she admitted making the following statement: "These moron Deps.  I'm tired of that punk, and I'll deal with this stupidity when I get home."  However, plaintiff indicated that the remark was made regarding a personal situation involving herself and the ADW with whom she had been intimate.

By interdepartmental memorandum to Warden Michael Pastena (Pastena) dated October 20, 1994[3], the Deputy Warden for Administration Errol D. Toulon (Toulon), recommended that

---

[2] Apparently, "deps" refers to Assistant Deputy Wardens.

[3] The parties do not explain the discrepancy in the dates.  Although dated prior to plaintiff's written report, Toulon's report clearly references that report and, thus, must post-date it.

3

plaintiff receive "Command Discipline"[4] for treating a supervisor with contempt or disrespect. In the memorandum, Toulon indicated that notwithstanding plaintiff's explanation for her remarks in her report, "under the circumstances, they were in appropriate [sic], especially because of the fragile working relationship that seems to exist between the [sic] she and A/D/W/ Davis."

On October 25, 1994, plaintiff was served with a Command Discipline charging her with violations of rule 3.15.140 (disrespect toward a superior), rule 3.15.150 (acting with contempt or disrespectfully in language or depourment [sic] toward a superior), and rule 3.15.250 (conduct unbecoming an officer). Toulon suggested that plaintiff lose two vacation days as a penalty. (Plf. Dep., p. 66). Plaintiff rejected both the penalty and Command Discipline and requested to proceed with a formal hearing.

On November 29, 1994, upon plaintiff's rejection of Command Discipline, Pastena commenced formal disciplinary proceedings by filing a "Memorandum of Complaint," in which he recommended that plaintiff lose ten (10) vacation days as a penalty for her conduct. On January 18, 1995, the office of the Chief of Operations approved the commencement of formal disciplinary charges.

Plaintiff received the Memorandum of Complaint on June 27, 1995 and on July 11, 1995, she consented to service of the charges against her by the Memorandum of Complaint. Also on that date, plaintiff appeared with her union counsel at an informal preliminary conference with the DOC's legal representative, Carl DiCarlo (DiCarlo). At the conference, the parties agreed to resolve the charges with a written reprimand, which would be expunged from plaintiff's record

---

[4] "Command Discipline is defined by a DOC directive as "informal, non-adversarial, non-judicial punishment * * * to correct minor deficiencies * * *." Individuals may reject Command Discipline and proceed to formal disciplinary proceedings.

within one year (the negotiated plea agreement).

On October 11, 1995, plaintiff's counsel, Nelson, Klein and Garber (NK&G), contacted DiCarlo and requested that the negotiated plea agreement be set aside pending disposition of the matter in negotiations with the DOC First Deputy Commissioner's Office (FDCO). On November 25, 1996, when DiCarlo failed to receive any further communications from NK&G, the formal disciplinary process was reactivated. Thereafter, the DOC offered plaintiff a penalty of losing five (5) vacation days, which plaintiff rejected on January 7, 1997.

On June 9, 1997, a hearing was held at the Office of Administrative Trials and Hearings (OATH) before Administrative Law Judge Charles R. Fraser (the ALJ), at which plaintiff was represented by other counsel. At the hearing, plaintiff testified, *inter alia*, that she used the words "moron," "stupid" and "punk" and that she said that she was "tired of these deps," but that she was referring to another ADW, a purported ex-lover of hers who was spreading gossip about her. The ALJ specifically discredited plaintiff's testimony, found plaintiff guilty of the charges and recommended that she be suspended without pay for fifteen (15) days.

On October 16, 1997, the DOC Commissioner at that time, Michael P. Jacobson (Jacobson), adopted the ALJ's recommended penalty. Plaintiff was suspended from November 7, 1997 to November 21, 1997.


2.     Plaintiff's April 1995 Reassignment

In March 1995, after the commencement of formal disciplinary proceedings against plaintiff, Terrence Skinner (Skinner), the Deputy Warden for Security at JATC at that time, received a report from Captain William Burgos (Burgos) and an anonymous letter indicating that

5

plaintiff had had information regarding a possible inmate action against COs that she had not reported. The matter was referred to the DOC Investigations Unit (IU).

According to defendants, as a result of the allegations, plaintiff was reassigned on April 3, 1995 from the JATC to the Brooklyn House of Detention for Men (BKHDM). According to plaintiff, she was reassigned because the officers wanted a male officer, specifically Captain Ralph Moran (Moran), and not her, to work the security post, and because of allegations that she was too friendly with the inmates. (Plf. Dep., pp. 89-94). Defendants maintain, and it is not disputed, that plaintiff was permitted to choose the borough facility to which she would be reassigned, and that she chose the BKHDM. It is also undisputed that plaintiff did not lose any benefits or salary as a result of the reassignment. (Transcript of the Examination Before Trial of Plaintiff on August 16, 2000 [Plf. Dep. II], p. 32).

By report dated March 15, 1996, the IU investigator, Sandra Coleman, found that the allegations that plaintiff was unduly familiar with inmates and that she had prior knowledge of a possible inmate uprising in JATC were unsubstantiated. The case was closed with no charges, but plaintiff was not transferred back to the JATC.

### 3. First Administrative Complaint

On July 2, 1995, plaintiff submitted an intradepartmental memorandum to the DOC's EEO office alleging that she was reassigned to the BKHDM in retaliation for her refusal to fabricate information regarding a "use of force" incident and to adopt or embrace Skinner's ideology, and because of her race and gender. Plaintiff also alleged that following her refusal to fabricate information, she was not invited to meetings and Skinner began delegating her

6

responsibilities to other officers.

On August 2, 1995, plaintiff filed a formal complaint of discrimination with the DOC's EEO claiming gender discrimination and that she was not afforded a hearing regarding her April 1995 reassignment.

### 4. Plaintiff's July 1996 Reassignment

On July 8, 1996, plaintiff was reassigned from the BKHDM to the Transportation Division (TD) on Riker's Island. At her deposition, plaintiff indicated that she was pleased by the transfer back to Riker's Island because she did not like the BKHDM. (Plf. Dep., p. 108).

### 5. Subsequent Administrative Complaints

On June 1, 1999, plaintiff filed a complaint with the United States Equal Opportunity Commission (EEOC) alleging discrimination based on race, color and gender and a hostile work environment.

On July 21, 1999, plaintiff filed a complaint against Skinner and ADW Walter Hamilton (Hamilton) with the DOC's EEO office alleging discrimination based on race, color and gender and retaliation for filing a complaint.

On October 1, 1999, the DOC's EEO office issued a report concluding that plaintiff's allegations were unsubstantiated. Specifically, the EEO investigator found, *inter alia*, (1) that plaintiff's allegations that the April 1995 and July 1996 reassignments were retaliatory were "disprovable" because the final decision to transfer plaintiff from the JATC to the BKHDM was made by Chief Eric Taylor (Taylor), who retired as of January 1, 1998, and the subsequent

7

transfer was made at plaintiff's request; (2) that the conduct of which plaintiff complained was occasioned by Skinner's dislike for her personally and her "oppositional" behavior toward the Departmental staff; and (3) that two other African-American female captains had decent working relationships with Skinner and Hamilton and had not experienced any mishaps with them, which disproved plaintiff's allegations of discrimination based on gender and race.

### 6. Plaintiff's Statistics

According to plaintiff's interpretation of the DOC Command Log for the period from 1995 through 1999, 420 black females employees were brought up on disciplinary charges, as compared to 163 while male employees who were brought up on charges, notwithstanding that white male employees outnumber black female employees at the DOC.[5] Moreover, plaintiff contends that none of the 163 white males were brought up on charges relating to the use of profanity,[6] and that all of the charges pertaining to the use of language involved black or

---

[5] It appears that plaintiff failed to recognize that once the Command Log pages are put in order by date (they were out of order in the exhibit provided to the court), every other page of the Command Log contains mostly duplicate entries from the previous page, presumably as a result of the photocopied paper being smaller than the Command Log pages. Accordingly, plaintiff's numbers are based on duplicate entries and are, thus, inaccurate. Excluding all of the duplicate entries, the statistics are as follows: of the 1144 legible entries, 113 or approximately 10% involved white males; and 267 or approximately 23% involved black females.

[6] Plaintiff's focus on violations of rule 3.20.010 (prohibition against the use of profanity), is misplaced, as plaintiff was charged with violations of rules 3.15.140 (disrespect toward superior), 3.15.150 (use of disrespectful language) and 3.15.250 (conduct unbecoming an officer). Nonetheless, it is true that no white males were charged with violating rule 3.20.010 in the Command Log.

Hispanic employees.[7]

Plaintiff further maintains that of the 163 white male employees who were brought up on charges, only thirty-six (36), or approximately twenty-two percent (22%), were assessed a penalty of any kind.[8] According to plaintiff, of the thirty-six white male employees who received penalties, four (4) or eleven percent (11%) received reprimands and nine (9) or twenty-five percent (25%) received corrective interviews.[9]

Plaintiff contends that of the 420 black female employees who were brought up on charges, 303 or seventy-two percent (72%) were assessed some type of penalty.[10] Plaintiff

---

[7] Plaintiff fails to recognize that she was also charged with conduct unbecoming an officer. In any event, the Command Log entries indicate that one black male was charged with violating rule 3.15.140 (disrespect toward a superior); four black males and two Hispanic males were charged with violating rule 3.15.150 (use of disrespectful language); and one black male was charged with violating rule 3.15.250 (conduct unbecoming an officer). In addition, the following entries involve presumably related charges: five black females and one black male were charged with violating rule 3.20.010 (use of profanity); 11 black males, 2 Hispanic males, 1 male of unknown color or nationality, 11 black females and one Hispanic female were charged with violating rule 3.20.190 (use of disrespectful language); and twelve black males, three white males, one male of unknown color or national origin, and two black females were charged with violating rule 3.20.030 (conduct unbecoming a member of the DOC).

[8] Of the 113 entries involving white males, forty (40) or approximately 35% were dismissed; eleven (11) or approximately 10% were referred for formal disciplinary proceedings; and forty-seven (47) or approximately 42% received some form of Command Discipline. The penalties of fifteen (15) of the entries could not be determined.

[9] Although plaintiff's numbers are wrong, her percentages are correct, albeit incomplete. Of the Command Discipline received by the forty-seven white males, thirty (30) or approximately 64% were assessed penalties of loss of vacation days ; five (5) or approximately 11% received reprimands; and twelve (12) or approximately 25% received corrective interviews.

[10] Of the 267 entries involving black females, seventy-eight (78) or approximately 29% were dismissed; forty-five or approximately 19% were referred for formal disciplinary proceedings; eleven (11) or approximately 4% were transferred out of the command or resigned before a penalty was assessed; and 101 or approximately 38% received some form of Command Discipline. Of the Command Discipline received, seventy-seven (77) or approximately 76%

further contends that of the nine (9) black females who were brought up on charges relating to the use of language, six (6) or sixty-six percent (66%) were assessed a penalty of a loss of vacation days and three of the charges were dismissed.[11]

B.     Procedural History

On September 17, 1999, plaintiff commenced this employment discrimination action against defendants under Title VII and section 1981, alleging discrimination based on race, color and gender, retaliation, and a hostile work environment. She also asserts a pendant state law claim for intentional infliction of emotional distress.

Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint in its entirety.

II.     ANALYSIS

A.     Summary Judgment Standard

Summary judgment should not be granted unless "the pleadings, depositions, answers to

---

were assessed penalties of loss of vacation or comp days; seven (7) or approximately 7% received a reprimand; and seventeen (17) or approximately 17% received corrective interviews. The penalties for thirty-two (32) of the entries could not be determined.

[11] Of the 267 entries involving black females, two (2) involved violations of rule 3.20.010 (use of profanity); eight (8) involved violations of rule 3.20.190 (use of disrespectful language); three (3) involved violations of both rules 3.20.010 and 3.20.190; and none involved violations of rule 3.15.150. Of the thirteen (13) entries involving black females charged with violations of rules regarding the use of language, five or approximately 38% were assessed a penalty of loss of vacation or comp days, one or approximately 8% received a corrective interview; one or approximately 8% received a reprimand; two or approximately 15% were referred for formal disciplinary proceedings; and four or approximately 31% were dismissed.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. See Id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. See Id. at 252, 106 S.Ct. 2505; Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

      B.     Title VII Claims

          1.     Time Bar

Defendants contend that any claims regarding incidents occurring prior to August 5, 1998, i.e. 300 days prior to plaintiff's filing of an EEOC complaint, are time-barred.

Plaintiff does not address this contention.

In New York, a Title VII claim is time-barred if the plaintiff, after filing a grievance with an appropriate state or local agency, does not file a charge with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); see National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Discrete discriminatory acts are not actionable if they are time-barred, even when they relate to acts alleged in timely-filed charges. See National Railroad, 536 U.S. at 113-114, 122 S.Ct. 2061; see also Forsyth v. Federation Employment and Guidance Service, 409 F.3d 565, 572 (2d Cir. 2005). As plaintiff filed her first administrative complaint with the EEOC on June 1, 1999, all of the acts of which she complains which occurred prior to August 5, 1998 are time-barred.[12]

2.    Discrimination Claims[13]

Defendants contend that to the extent plaintiff's Title VII claims are not time-barred, she cannot establish a prima facie case of discrimination because she cannot demonstrate that she suffered an adverse employment action or that the actions of which she complain took place under circumstances given rise to an inference of discrimination.

Plaintiff contends that there are questions of fact regarding, *inter alia*, the disparate treatment she received for the use of profanity and defendants' motivation in punishing her.

Absent direct evidence of discrimination, discrimination claims under Title VII, 42

---

[12] Although a narrow exception to the limitation period exists when an otherwise time-barred claim is part of a "continuing violation." See Gross v. National Broadcasting Co., 232 F.Supp.2d 58, 68 (S.D.N.Y. 2002); Everson v. New York City Transit Auth., 216 F.Supp.2d 71, 79 (E.D.N.Y. 2002), plaintiff does not allege, and has not established, that the discriminatory acts of which she complains are part of such a "continuing violation." Moreover, although the 300-day limitation period is subject to equitable doctrines such as tolling and estoppel, see National Railroad, 536 U.S. at 113, 122 S.Ct. 2061, plaintiff does not allege, and has not established, that any such equitable doctrines should be applied.

[13] Since claims under section 1981, which pertain only to racial discrimination, are analyzed under the same rubric as Title VII claims, the following analysis is equally applicable to plaintiff's racial discrimination claims under section 1981, to the extent that they, too, are not time-barred as set forth below.

U.S.C. § 2000e-2[14], are analyzed under the burden-shifting framework of McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Mandell v. County of

Suffolk, 316 F.3d 368, 377 (2d Cir. 2003). Under the McDonnell Douglas analysis, a plaintiff

must first establish a prima face case of discrimination. 411 U.S. 792, 93 S.Ct. 1817. To

establish a prima facie claim of employment discrimination under Title VII a plaintiff must show

(1) that he or she belonged to a protected class; (2) that he or she was otherwise qualified for the

position; (3) that he or she suffered an adverse employment action; and (4) that "the adverse

employment action occurred under circumstances giving rise to an inference of discriminatory

intent." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); see also Sanders v. New York City

Human Resources Admin., 361 F.3d 749, 755 (2d Cir. 2004). The burden of establishing a prima

face case is minimal. Mandell, 316 F.3d at 378; de la Cruz v. New York City Human Resources

Admin. Dept. of Social Services, 82 F.3d 16, 20 (2d Cir. 1996).

Once the plaintiff has established a prima facie case of employment discrimination, the

burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions.

McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant satisfies its burden, the

plaintiff must establish that the defendant's reason was merely a pretext for discrimination. Id. at

804, 93 S.Ct. 1817. In order to defeat summary judgment, the plaintiff must show, by a

preponderance of the evidence, circumstances "that would be sufficient to permit a rational

---

[14] 42 U.S.C. 2000e-2(a) provides, in pertinent part, that "[i]t shall be an unlawful
employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual,
or otherwise to discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race, color, religion, sex, or
national origin* * *."

finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry, 336 F.3d at 138.

Defendants do not dispute that plaintiff established the first two elements of a prima facie case of discrimination. Rather, defendants contend that plaintiff cannot establish that she suffered an adverse employment action or that any adverse employment action occurred under circumstances giving rise to an inference of discrimination.

<blockquote>a. Adverse Employment Action</blockquote>

Defendants contend that plaintiff's allegations (1) that female officers were not provided with identical locker room facilities as male officers; and (2) that the DOC failed to properly investigate her 1995 complaint, do not constitute adverse employment actions.

Plaintiff contends that the loss of time and pay accompanying her suspension constitutes an adverse employment action. Plaintiff does not otherwise address this contention.

"An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Ci. 2005) (quoting Terry, 336 F.3d at 138) (internal quotations and citations omitted). The Second Circuit has recognized that examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices [] unique to a particular situation." Id. (internal quotations and citations omitted). In addition, an internal transfer accompanied by a negative change in the terms and conditions of employment may also constitute an adverse employment action. Terry 336 F.3d at

139, 144; see also de la Cruz, 82 F.3d at 21 (finding that an internal transfer to a less prestigious unit with little opportunity for professional growth alters the terms and conditions of employment in a negative way and, thus, constitutes an adverse employment action).

Defendants are correct in their contention that plaintiff's allegations (1) that female officers were not provided with identical locker room facilities as male officers; and (2) that the DOC failed to properly investigate her 1995 complaint of discrimination, do not constitute adverse employment actions. Accordingly, summary judgment dismissing plaintiff's discrimination claims based on those assertions is warranted.

### b. Inference of Discrimination

Defendants contend, *inter alia*, that the OATH hearing and plaintiff's subsequent suspension cannot be said to have occurred under circumstances given rise to an inference of discrimination because (1) OATH is a separate entity independent from the DOC; and (2) plaintiff was given numerous opportunities to settle the matter for lesser penalties, but chose not to do so.

Plaintiff contends that defendants' records, in particular the Command Log, establish that they punish blacks and females more frequently than white males for the same infractions. According to plaintiff, since no white male was ever charged with violating a rule regarding the use of language, a question of fact exists regarding whether her discipline occurred under circumstances giving rise to an inference of discrimination.

In reply, defendants contend that plaintiff is not similarly situated to the black females listed in the Command Log because (1) plaintiff did not receive Command Discipline, but rather

15

was disciplined after a full evidentiary hearing; (2) the black females in the Command Log are of varying ranks, whereas plaintiff was a captain; and (3) plaintiff was no longer working at the JATC after April 4, 1995, and, thus, was not charged with violations during the time frame encompassed by the Command Log. According to defendants, even assuming the relevancy of the Command Log, twenty (20) white male captains were charged and/or disciplined, in comparison to four (4) black female captains.[15] Moreover, according to defendants, of the four black female captains charged with disciplinary violations, only one was actually penalized.

"A showing of disparate treatment[16]–that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group–is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." Mandell, 316 F.3d at 379 (internal quotations and citation omitted). In order to establish a disparate treatment claim, the plaintiff must show that he or she was "similarly situated in all material respects to the individuals with whom [he or she] seeks to compare [himself or herself]." Id. (internal quotations and citation omitted). Generally, the question of whether two employees are similarly situated is a triable issue for the fact finder. Id.; Graham v. Long Island Railroad, 230 F.3d 34, 39 (2d Cir. 2000). Nonetheless, a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees. Khan v. Costco Wholesale Inc., No. 99 CV 3944, 2001 WL 1602168, at * 7 (E.D.N.Y. Dec. 13, 2001); see also Spiegler v. Israel Discount Bank of New

---

[15] Defendants' numbers are accurate. Of the seventy-three captains who were disciplined, 27% were white males and 5% were black females.

[16] Plaintiff has not raised a disparate impact claim.

16

York, No. 01 Civ. 6364, 2003 WL 21983018, at * 2 (S.D.N.Y. Aug. 19, 2003)(holding that a court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met).

The determination of whether a plaintiff is similarly situated to other individuals in "all material respects," varies on a case by case basis, but must be judged based on (1) whether the plaintiff and those individuals whom he or she maintains are similarly situated to him or her were subject to the same workplace standards; and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. Graham, 230 F.3d at 40. The plaintiff's conduct need not be identical to that of the employee with whom he or she seeks to compare himself or herself in order for the two to be considered similarly situated; rather, there need only be an "objectively identifiable basis for comparability," that is "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Id. The determination of whether two acts are of comparable seriousness requires an examination of the acts themselves, as well as of the context and surrounding circumstances in which those acts are evaluated. Id.

As correctly noted by defendants, because plaintiff is a captain, she is not similarly situated to the majority of black females with whom she seeks to compare herself. Further, plaintiff is only arguably similarly situated with the four black female captains who were disciplined in the Command Log. However, as the evidence in the record establishes that more white male captains were brought up on disciplinary charges than their black female counterparts, as a matter of law plaintiff cannot establish an inference of discrimination.

In addition, even assuming that plaintiff was subject to the same workplace standards as the black female COs listed in the Command Log, and, thus, could arguably be said to be

17

similarly situated to those other black females in that respect, she has failed to offer any evidence

that those other black females rejected Command Discipline, repeatedly refused lesser penalties,

or elected to proceed with formal disciplinary proceedings and an evidentiary hearing.

Accordingly, plaintiff cannot establish that she is similarly situated to any of the other black

females, captain or not, with whom she seeks to compare herself. Therefore, to the extent

plaintiff's discrimination claims are not time-barred, summary judgment is warranted dismissing

those claims in their entirety.


### 3. Retaliation Claims[17]

Defendants contend that even assuming, *arguendo*, that plaintiff engaged in a protected

activity of which the DOC knew, she cannot demonstrate any adverse employment action or a

causal link between the protected activity and the challenged conduct.

Plaintiff does not address her retaliation claims in her opposition.

The McDonnell Douglas burden-shifting analysis also applies to retaliation claims

brought pursuant to Title VII, 42 U.S.C. § 2000e-3. Terry, 336 F.3d at 141; Davis v. State Univ.

of New York, 802 F.2d 638, 642 (2d Cir. 1986). To establish a prima facie case of retaliation

under Title VII, an employee must show (1) that he or she participated in a protected activity

known to the defendant; (2) an adverse employment action; and (3) a causal connection between

the protected activity and the adverse employment action. Terry, 336 F.3d at141; Raniola v.

---

[17] 42 U.S.C. § 2000e-3 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees * * *, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Bratton, 243 F.3d 610, 624 (2d Cir. 2001). "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Terry, 336 F.3d at 140-141 (internal quotations and citation omitted). However, a retaliatory motive must be "at least a substantial or motivating factor behind the adverse action." Raniola, 243 F.3d at 625 (internal quotations and citations omitted).

### a.     Adverse Employment Action

Defendants contend, and plaintiff does not dispute, that plaintiff's reassignment to the Transportation Division does not constitute an adverse employment action because she was pleased with the transfer and she did not lose any pay, time or benefits as a result of the transfer. Accordingly, summary judgment dismissing plaintiff's retaliation claim based upon that reassignment is warranted.

### b.     Causal Connection

Defendants contend, *inter alia*, that since plaintiff's reassignment to the BKHDM occurred prior to her filing of the first EEO complaint, there is no causal connection between that act and a protected activity. In addition, defendants contend that there is no causal connection between a protected activity and the OATH hearing and subsequent suspension because plaintiff was offered more lenient penalties after the filing of the complaints and it was not until plaintiff's counsel rejected the negotiated plea agreement, and more than one year had elapsed, that the DOC proceeded with the disciplinary process.

A plaintiff may establish that retaliation was a "substantial or motivating factor" behind

an adverse employment action either (1) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Raniola, 243 F.3d at 624 (internal quotations and citation omitted); see, Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003) (internal quotations and citation omitted). "[T]he interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months." Ashok, 289 F.Supp.2d at 314.

Plaintiff has not proffered any direct evidence of retaliatory animus directed against her by defendants. Moreover, plaintiff has failed to establish any causal connection between the acts of which she complains and the filing of her first internal complaint of discrimination with the DOC's EEO office on July 2, 1995. Clearly, any conduct which occurred prior to that time cannot be said to be causally related to a protected activity. The first conduct of which plaintiff complains occurring after the filing of that complaint was her reassignment from the BKHDM to the Transportation Division on July 8, 1996, which, as noted above, did not constitute an adverse employment action. However, even assuming that the reassignment constituted an adverse employment action, such conduct occurred more than one year after the filing of the complaint and, thus, there is no causal connection between the two events. See, e.g. Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990)(passage of three months is too long); Lambert v. New York State Office of Mental Health, No. 97-CV-1347, 2000 WL 574193, at * 9-10 (E.D.N.Y. Apr. 24, 2000), aff'd, 22 Fed. Appx. 71 (2d Cir. Nov. 28, 2001)(passage of five months is too long). Since plaintiff does not complain about any other specific conduct

occurring after that date, summary judgment dismissing her retaliation claims is appropriate.

### 4. Hostile Work Environment

Defendants contend that plaintiff's allegation that her peers did not speak to her for three to four months because they considered her a "snitch" is insufficient to establish a hostile work environment claim, particularly since plaintiff admits that she now has a good working relationship with them. Moreover, defendants contend that plaintiff cannot establish that the challenged conduct was motivated by race or gender, particularly since she claims that they were occasioned by a belief that she was a "snitch."

Plaintiff does not address her hostile work environment claim.

"A Title VII hostile work environment claim requires a showing that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Fairbrother, 412 F.3d at 48 (internal quotations and citations omitted); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004)(holding that in order to establish a hostile work environment claim under Title VII, a plaintiff must first show harassing behavior "sufficiently severe or pervasive to alter the conditions of [his or her] employment"). The plaintiff must demonstrate that his or her workplace was "so severely permeated with discriminatory intimidation, ridicule and insult that the terms and conditions of [his or] her employment were thereby altered." Fairbrother, 412 F.3d at 48. "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999); see also Fairbrother, 412 F.3d at 48 (holding that a

hostile work environment claim has both objective and subjective elements); Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (accord).

A plaintiff may establish a hostile work environment claim by showing either that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or her] working environment." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000). In considering a motion for summary judgment dismissing a hostile work environment claim, the court must determine "whether a rational fact-finder could conclude, on the basis of the evidence in the record, that the conditions of [plaintiff's] employment were sufficiently 'severe or pervasive' to create an objectively hostile or abusive work environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In determining whether a plaintiff has established a hostile work environment claim, the court must look to the totality of circumstances. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004). Factors that the court should consider in making its hostile work environment determination include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. 367. However, "no single factor is required." Id.

Second Circuit precedent "allows a combination of seemingly minor incidents to form the basis of a [hostile work environment] claim once they reach a critical mass." Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004)(internal quotations and citation omitted). However, "incidents

22

must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," Terry, 336 F.3d at 148 (internal quotations and citation omitted), and incidents that are "relatively minor and infrequent" are insufficient to sustain a hostile work environment claim. Deters, 368 F.3d at 189.

The conduct of which plaintiff complains is comprised of relatively minor and episodic incidents that do not rise to the level of pervasiveness sufficient to sustain a hostile work environment claim. In addition, as a matter of law, none of the conduct of which plaintiff complains is sufficiently severe so as to establish a hostile work environment claim. See, e.g. Ruggieri v. Harrington, 146 F.Supp.2d 202, 217-218 (E.D.N.Y. 2001)(holding that minor annoyances and perceived slights do not constitute severe or pervasive harassment).

Moreover, a plaintiff alleging a hostile work environment claim must also establish that "the conduct at issue was not merely tinged with offensive connotations, but actually constituted *discrimination* because of [race or another protected category]." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(emphasis in original)(internal quotations and citations omitted); see also Brennan, 192 F.3d at 318 (holding that to prove the existence of a hostile work environment, the plaintiff must demonstrate that he or she was subjected to the hostility because of his or her membership in a protected class). Plaintiff's allegations that her environment was hostile because she was labeled as a "snitch" does not satisfy the discrimination element of a hostile work environment claim. Accordingly, plaintiff cannot establish a hostile work environment claim. See, e.g. Olle v. Columbia University, 332 F.Supp.2d 599, 615 (S.D.N.Y. 2004), aff'd, 136 Fed.Appx. 383 (2d Cir. 2005)(granting defendants' motion for summary judgment dismissing plaintiff's hostile work

23

environment claims where, *inter alia*, plaintiff failed to demonstrate that most of the behavior at issue could reasonably be understood to be offensive or discriminatory).

### C.    42 U.S.C. §1981 Claims[18]

#### 1.    Time Bar

Defendants contend that any claim brought pursuant to section 1981 which accrued prior to September 17, 1995 is time-barred.

Plaintiff does not refute this contention.

Employment discrimination claims arising under the 1991 amendments to section 1981 are subject to the four-year federal "catch-all" statute of limitations established by 28 U.S.C. § 1658(a). Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S.Ct. 1836, 1846, 158 L.Ed.2d 645 (2004)[19]; see also Fernandez v. M & L Milevoi Management, Inc., 357 F.Supp.2d 644, 651 (E.D.N.Y. 2005) (concluding that a four-year statute of limitations applied to plaintiff's section 1981 claims). As plaintiff's section 1981 claims allege discrimination and retaliation arising after her employment relationship with defendants was formed, those claims arise under section 1981(b), which was enacted as part of the 1991 amendment to section 1981[20]. Accordingly,

---

[18] Section 1981 prohibits racial discrimination with respect to "the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Whidbee, 223 F.3d at 68-69.

[19] Prior to R.R. Donnelley, federal courts traditionally applied the forum state's statute of limitations for personal injury actions to section 1981 claims. Accordingly, prior to R.R. Donnelley, the statute of limitations for section 1981 claims was three years from the date the cause of action accrued.

[20] The 1991 amendments to section 1981 made clear that racial discrimination in the making and enforcement of contracts, including employment contracts, applied to all phases and

plaintiff's section 1981 claims are governed by a four year statute of limitations. Since plaintiff

filed this action on September 17, 1999, any claims alleging discrimination or retaliation

occurring prior to September 17, 1995 are time-barred and are, therefore, dismissed. See, e.g.

Bedden-Hurley v. New York City Board of Education, 385 F.Supp.2d 274, 278 (S.D.N.Y.

2005)(dismissing as time-barred plaintiff's section 1981 claims alleging discrimination or

retaliation occurring more than four years prior to the date the action was commenced).


2.      Failure to State a Cause of Action

Defendants contend that plaintiff's section 1981 claims must be dismissed because she

does not allege that a policy of the City of New York (the City) caused the alleged deprivation of

her civil rights. Defendants further contend that to the extent plaintiff asserts a claim against the

Commissioner in his personal capacity, such a claim must be dismissed because there are no

allegations that he was personally involved in any of the acts of which she complains.

Plaintiff does not address this defense.


a.      Municipal Policy or Custom

In order to establish liability under section 1981 against a municipal agency or individual

sued in his or her official capacity, a plaintiff must demonstrate that the challenged acts were

performed pursuant to a municipal policy or custom. Patterson v. County of Oneida, N.Y., 375

F.3d 206, 226 (2d Cir. 2004). Since plaintiff has failed to establish, or even allege, that the acts

---

incidents of the contractual relationship and not just to discriminatory hiring. Fernandez, 357
F.Supp.2d at 649-650 (internal quotations and citation omitted).

of which she complains were performed pursuant to a municipal policy or custom, summary judgment dismissing her section 1981 claims against the DOC and the Commissioner in his official capacity is warranted. See, e.g. Richards v. Calvet, No. 99 CV 12172, 2005 WL 743251, at * 13 (S.D.N.Y. Mar. 31, 2005)(granting summary judgment dismissing plaintiff's section 1981 claims where there was no evidence of a discriminatory municipal policy or custom); King v. Bratton, No. 96 CV 1131, 2004 WL 3090605, at *4, n. 2 (E.D.N.Y. Aug. 25, 2004) (dismissing the plaintiff's section 1981 claim where he made no effort to demonstrate that the alleged discriminatory acts were performed pursuant to a policy or custom of the municipality).

> b. Claims against the Commissioner in his Personal Capacity

Unlike Title VII, individuals may be held personally liable under section 1981. See Whidbee, 223 F.3d at 75. However, in order to establish individual liability under section 1981, the plaintiff must demonstrate (1) "some affirmative link to causally connect the actor with the discriminatory action," Id. (internal quotations and citations omitted); (2) that the actor's behavior was racially motivated, see Ige v. Command Sec. Corp., No. 99-CV-6916, 2002 WL 720944, at * 9 (E.D.N.Y. May 12, 2002); and (3) that the alleged discrimination was intentional, see Tardd v. Brookhaven Nat. Laboratory, __ F.Supp.2d __, 2006 WL 41228, at * 5 (E.D.N.Y. Jan. 7, 2006). "A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." Whidbee, 223 F.3d at 75 (internal quotations and citations omitted).

Plaintiff fails to allege (1) that the Commissioner was personally involved in any of the acts of which she complains; or (2) that any of his conduct was racially motivated or intentionally

discriminatory. Accordingly, summary judgment dismissing plaintiff's section 1981 claim against the Commissioner in his personal capacity is warranted. See, e.g. Ige, 2002 WL 720944, at * 9 (dismissing plaintiff's section 1981 claim against the defendant in his personal capacity where plaintiff failed to show that his actions were racially motivated).

D.    Pendant State Law Claim

Defendants contend that plaintiff's state law claim must be dismissed because she failed to comply with the notice of claim requirements of New York General Municipal Law §50-e and this Court lacks jurisdiction to grant an application to file a late notice of claim. Plaintiff concedes that she cannot meet the threshold requirements to state a claim for intentional infliction of emotional distress under New York law and that, therefore, this claim must be dismissed. (Declaration of Joseph Fleming, Esq., in Opposition to Defendants' Motion for Summary Judgment, ¶22). Accordingly, plaintiff's state law claim for intentional infliction of emotional distress is dismissed.

III.    CONCLUSION

Defendants' motion for summary judgment is granted and the complaint is dismissed in its entirety.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated:    January 30, 2006
         Central Islip, New York

27

Copies to:

Joseph Fleming, Esq.
45 John Street, Suite 205
New York, New York 10038

Corporation Counsel of the
City of New York
100 Church Street, Room 2-140
New York, New York 10007

Wilson Elser Moscowitz
Edelman & Dicker
150 East 42nd Street
New York, New York 10017